E-FILING

ADR

Filed

FEB 13 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF COURT
SAN JOSE CALIFORNIA

Fees paid

KATE WELLS, CSB #107051
2600 Fresno Street
Santa Cruz, California 95062
(831) 479-4475 FAX: (831) 479-4476
lioness@got.net

AARON LODGE, CSB #220670
1414 Soquel Avenue, Suite 212
Santa Cruz, California 95062
(831) 600-3030, FAX: (831) 603-4300
alodge@teachjustice.com

Attorneys for plaintiff, ISAAC VALDIVIA

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

ISAAC VALDIVIA,

    Plaintiff,

v.

COUNTY OF SANTA CRUZ; STEVE ROBBINS; TEN UNKOWN CORRECTIONAL OFFICERS; TEN UNKOWN OTHER COUNTY EMPLOYEES,

    Defendants

Case Number: C 08 00916 HRL

**COMPLAINT FOR DAMGES FOR VIOLATION OF CIVIL RIGHTS**

**DEMAND FOR JURY TRIAL**

Plaintiff, ISAAC VALDIVIA, alleges as follows:

## JURISDICTION AND VENUE

1. This action arises under the Civil Rights Act of 1871 (42 U.S.C. Sections 1983 and 1988) and the Eighth Amendment to the Constitution of the United States. This Court has jurisdiction of the federal claims under 28 U.S.C. Section 1331, 1332, 1343(3) 1343(4), 2201, and 2202.

VALDIVIA v. COUNTY OF SANTA CRUZ - 1

2. Venue is proper in the Northern District of California, San Jose Division, pursuant to 28 U.S.C. § 1391, in that the subject matter of this action arose in this district, all defendants are subject to personal jurisdiction in this district, and there is no district in which the action may otherwise be brought.

## PARTIES

3. Plaintiff ISAAC VALDIVIA (hereinafter referred to as "plaintiff") is, and at all relevant times herein was, a resident of the County of Santa Cruz, State of California.

4. Defendant COUNTY OF SANTA CRUZ (hereinafter "COUNTY") is a political subdivision of the State of California.

5. Defendant Sheriff STEVE ROBBINS (hereinafter "ROBBINS") is the elected Sheriff of the County of Santa Cruz and as part of his duties as Sheriff is charged with the administration of the Santa Cruz COUNTY jail and its personnel. In performing or failing to perform the acts as herein alleged, ROBBINS was acting as an agent of the COUNTY and/or was acting individually, outside the course and scope of his employment with the COUNTY. In performing, or failing to perform, all the acts herein alleged, ROBBINS acted under color of state law and the statutes, ordinances, regulations, customs and usages of the of the COUNTY, and pursuant to the official policy, custom and practice of COUNTY. As the administrator of the COUNTY jail, ROBBINS is charged with protecting the constitutional rights of the inmates. As the Sheriff of the COUNTY, ROBBINS is charged with training and educating the COUNTY sheriff's deputies and correctional officers with regards to the constitutional rights of the inmates at the COUNTY mail.

6. DOES ONE through TWENTY (collectively referred to as the "OFFICERS" or "COUNTY PERSONNEL" or "DOES") were sheriff's deputies and/or correctional officers and/or other COUNTY personnel; in performing the acts alleged herein, the DOES were acting as agents of the COUNTY employed by the COUNTY and/or were acting individually, outside the course and scope of their employment; and, in performing all of the acts alleged herein, these defendants acted under color of state law and the statutes, ordinances, regulations, customs and usages of the COUNTY, and pursuant to the official policy, custom and practice of COUNTY. The DOES are charged with enforcing state and local laws and additionally charged with knowledge and protection of citizens' constitutional rights while enforcing such laws.

7. The names and capacities of defendants DOES 1 through 20 are unknown to the plaintiff. Each of these fictitiously named parties has acted as agent of or in concert with the named defendants in the matters referred to herein and is responsible in some manner for the damages suffered by plaintiff. Plaintiff will amend this complaint to add the names and capacities of such defendants when ascertained.

### FACTS *PRIOR* TO INCIDENT GIVING RISE TO THIS ACTION
### (FACTS THROUGH FALL 2005)

8. Plaintiff is a Hispanic male and has lived most all of his life in Santa Cruz County. When he was fourteen years old, he became friends with members of the Norteno gang. The specific branch of the gang, known locally as the "Las Lomas Boys," or the "Lomeros," was an enemy of the "Northside" branch of the Nortenos. At some point

during his teens, plaintiff became a member of the Las Lomas Boys, and remained a member until 1985 when plaintiff was twenty three years old.

9. As a member of Lomeros, plaintiff had a number of tattoos placed on his body. These tattoos marked him as a member of his specific gang. The tattoos on plaintiff's body remain fairly "loud," and highly visible, marking him as a gang member. Anybody with knowledge of gangs would quickly be able to identify plaintiff's particular prior gang affiliation, and would also realize that the Northside gang was an enemy gang.

10. During his teen years plaintiff experimented with numerous types of drugs and also drank alcohol regularly. He developed a drug and alcohol problem which persisted long after he had left the gang. On several occasions, plaintiff was arrested for a variety of drug- related violations. As a result, he has been in and out of local jails since the late 1980's, sometimes serving for just a few days, and sometimes serving for many weeks.

11. By the age of twenty-three, plaintiff made the conscious choice to withdraw from active membership in any gang. Plaintiff, having children of his own, believed he could be the best father by completely separating and dissociating from his past gang affiliation.

12. After plaintiff was no longer an active member of the gang, he lived a normal life, maintaining a steady job for over ten years, and supporting his children. He stayed away from anyone or any group that might be affiliated with gang activity. However, he continued to sporadically use unlawful drugs and drink alcohol. On several occasions, plaintiff was arrested on drug charges. On those occasions, plaintiff was terrified of being placed in a jail cell with former gang members that might recognize him and ask him to participate in gang activities. DOES were well aware of the danger that

former gang members, including plaintiff herein, face. It was, and is, the duty of all defendants to take measures to protect individuals, such as plaintiff herein, who have taken steps to reject their former gangs. It is well known by defendants that by cutting off his gang affiliation, plaintiff was at risk of serious bodily injury if housed with active gang members in the COUNTY jail.

13. The incident giving rise to this action occurred on March 18, 2006. However prior to that on July 29, 1999, plaintiff was arrested for a DUI and on February 12, 2000, plaintiff was arrested and charged with possession of drug paraphernalia, possession, and possession for sale and plaintiff was sentenced to time in the COUNTY jail. Plaintiff made it clear to the officers at the jail that he was no longer an active gang member and that housing him with active gang members would place him at risk of serious injury. The officer in charge of assessing Mr. Valdivia and determining where he should be located wrote that Mr. Valdivia should be placed in isolation security. The officer wrote that the normal custody scale should be overridden. He further stated there is an "unknown danger of assault/to assault/escape because of changes." It was clear to the officers in charge of plaintiff's custody that he was in great danger because of his status as a gang "dropout" and said status was noted in the records.

14. On November 18, 2000, plaintiff was stopped while driving with a suspended license. This was a parole violation, so he was again taken into custody. This time, he was placed at Rountree, a medium security facility. He served his time there without incident.

15. On October 20, 2001, plaintiff was again arrested for possession, and taken into custody for a parole violation. Once again, the unknown officer in charge of

determining custody level placed plaintiff in isolation security due to his "former gang member" status. Plaintiff served a week in jail and was released without incident.

16. On June 25, 2003, plaintiff was arrested for violating the Health and Safety Code, Section 11377(A), a violation of illegal possession of drugs, and sentenced to COUNTY jail. The officer in charge of determining custody level again recommended overriding the scale of custody. Plaintiff informed the officers that he had enemies in the prison and that the gang members would know that plaintiff was a gang dropout. The officer wrote "rack in O until further review." Ignoring the warnings, plaintiff was ultimately placed by defendants in a gang unit called "unit M."

17. The gang members in unit M pressured plaintiff to rejoin the gang and when plaintiff refused, the gang members surrounded him and threatened to "take him out." At that time plaintiff hit the "panic button," which is an emergency call for help to the officers on duty. Also, pushing the panic button provides protective custody and is thus known inside the prison as "PCing up," or "rolling up."

18. The officers at the COUNTY jail are fully aware that once an inmate "PCs" or "rolls up", that inmate is immediately classified by other inmates as a "degenerate" and is considered no longer worthy of living as having "lost the values of the gang." The gang members then "tag" the inmate as being no good. Gang members spread the word through oral and written "no good lists," or "NGLs." Months or even years can go by, but the lists prevail. Once a former gang member is tagged as a degenerate coward, having lost the "good values" of the gang, that former member is forever in danger of retaliation from the gang. Officers at the COUNTY jail have knowledge of these gang

practices and are charged with protecting former gang members from serious injury or death from the active gang members.

19. Once plaintiff hit the panic button, the officers immediately arrived and removed him from the gang unit. Thus, plaintiff had successfully "PC'd", and had at the same time formally announced to the gang members his disassociation from the gang, thereby becoming a formal "dropout." He served out his remaining time in protective custody without incident.

20. After being released plaintiff knew that once he was a formal dropout (and not just inactive), he would be a target for any gang member, or any person who had ties to his former gang. Thus, if plaintiff was to be confronted by an active gang member who knew he was a dropout, the active gang member would take violent action against him. One common such violent action is to severely cut or lacerate a former gang member's face, so as to mark them for life in a very visible way, so that, in the future, any and all gang members will recognize the victim as a dropout.

21. Furthermore, members from other gangs, even enemy gangs, were a potential threat because gang members often take violent action against *anyone* who was once in any gang and who has completely disassociated from his/her gang. "Dropouts" are universally viewed by gangs as no longer worthy, as cowards, and as disrespecting the entire gang world.

**FACTS REGARDING SPECIFIC INCIDENT GIVING RISE TO THIS ACTION**

22. At 43 years old (2005), plaintiff had made substantial growth in his own life. A few years had passed since plaintiff had been involved in any arrest or other police activity. He was no longer using drugs, was no longer drinking alcohol and was making

sure that he did not violate any part of his probation rules. Gangs and gang affiliation of any kind was far in his past. On August 31, 2005, plaintiff still had a suspended license and thus was careful not to drive any car. One day, he needed to transport his daughter somewhere, so he called an old friend who agreed to drive them. When the friend arrived, before plaintiff and his daughter got into the vehicle, plaintiff noticed that there was some ammunition in the car and plaintiff did not want his daughter to see the ammunition, so he put it in his pocket until the end of the ride. There was no gun in the car.

23. While he was riding in the friend's car as a passenger with his daughter, the police pulled over the car, and discovered that the car was stolen, a fact that was unknown to the plaintiff. All the occupants were searched, and plaintiff was once again taken into custody due to the ammo he had placed in his pocket.

24. Within a few days, the facts of the arrest were sorted out and ascertained by the police and plaintiff was only charged with a violation of probation related to having any type of ammunition on his person and he was released on his own recognizance.

25. On March 10, 2006, plaintiff was sentenced to 85 days in COUNTY jail from this incident and he was taken into custody to serve out his term. On his booking classification assessment, plaintiff wrote "no?" in response to the question of whether he was involved with a gang. Plaintiff informed the DOE defendant officers at the time that he had been affiliated with a gang, but had dropped out. The scale summary sheet was never filled out by the DOE defendants. Plaintiff was sent to the jail farm, a minimum security facility. After a few days, plaintiff complained about racist remarks by other inmates. He was afraid that there would be trouble so plaintiff informed one of the officers at the jail farm.

26. About a week later, on March 16, 2006, plaintiff was re-housed to the main jail "for his safety and the safety of the facility." Although plaintiff had been relatively safe while at the jail farm, a minimum security facility with no active gang members, he would be in much greater danger while at the main jail. At the main jail there were several units for gangs, and plaintiff knew he would not be safe if placed in any unit or area with gang members.

27. Plaintiff knew that one of his sons was in one of the units at the jail so he asked if he could be placed in the same unit with his son. Plaintiff believed he would be safe if placed with his son. Plaintiff knew and informed the DOE defendant officers that if placed in any other unit with gang members, he would not be safe. Plaintiff informed the DOES that he had seen many times in the past what happens to former gang members who officially dropped out of the gangs, and he was terrified that would happen to him. Plaintiff again reminded the DOES that he should not be placed in the gang unit, or any unit with gang members, due to his legitimate fear for his safety.

28. Plaintiff is informed and believes and alleges thereon that the officers at the COUNTY jail sometimes placed ex-gang members into gang cells "for the fun of it," or just to see what happens. Plaintiff was aware that such violent incidents occurred regularly, and the officers did little to protect the inmates and instead sometimes facilitated these violent episodes.

29. Disregarding plaintiff's multiple warnings and pleas not to place him in an active gang unit, the DOE officers placed him in the "M" unit, a unit designed for gang members. Even worse for plaintiff, the M unit housed Northside gang members, which gang was a serious enemy to plaintiff's former gang of Las Lomas. Once placed in there,

word quickly spread that plaintiff was a dropout and had dissociated from the gang. Word likewise spread that he had "rolled up" in prior custody. Therefore, he was immediately targeted. Within 48 hours he was attacked and severely beaten by the active gang members.

30. The attack occurred on March 18, 2006. Plaintiff was in the M unit and was surrounded by enemy gang members. He was not able to get to the panic button. The gang members told plaintiff that they had found out that he had "PCd up," and had refused to program with the gang. They called him a coward. One member broke off a solid metal door handle knob from the door and approached him. The others continued to surround him. The member with the door knob then attacked him, hitting him in the face, head and body. He fought back, but was restrained and further beaten by others. DOE officers found plaintiff barely conscious, heavily bleeding on the floor.

31. Instead of transporting plaintiff immediately to the hospital for treatment, DOE officers took him to a doctor in the jail. When he regained consciousness, he was in excruciating pain and was terrified and in a state of shock. DOE officers, even though they knew that plaintiff had been beaten by the gang members in the unit, told the doctor that plaintiff suffered injuries from a fall.

32. The doctor at the jail determined that plaintiff's injuries were too severe to be treated within the jail and he was transferred to Dominican Hospital for treatment. The DOE officer in charge of the transfer stated to the hospital that plaintiff had fallen down despite his knowledge to the contrary. The receiving doctor stated at the time "this is BS for the jail to call this another fall."

33. Plaintiff spent over 8 hours in the hospital. He was diagnosed with a concussion, which has since been proven to be so severe that doctors have confirmed it will be years before healing and it may be that the damage is permanent. His hand was broken. He suffered neurological damage. His face was so severely slashed that he is now forever marked; the gash required extensive stitches. He has had bloody stools ever since the jail attack.

34. Following the attack, plaintiff was transferred back into custody. Plaintiff thereafter continuously complained to the DOE officers about his pain and his complaints were ignored. Finally, plaintiff began to place his complaints in writing. For example, his hand was in pain, he could not move his hand. He asked for pain medication and for treatment. The DOE defendants, without consulting a doctor, denied his hand was broken, and refused to treat him. He had many other symptoms, all of which were ignored by the DOE defendants and which went untreated while in custody at the COUNTY jail.

35. As a result of the beating and the lack of treatment at the jail, plaintiff is still suffering and will continue to suffer in the future. For instance, it has since been confirmed that plaintiff's hand was broken and because the DOE defendants refused to treat his injury, he has lost the use of his hand. The doctors who examined plaintiff after he was out of custody have stated that he may never regain full use of his hand. Plaintiff also suffered severe and debilitating injuries as a result of the beating and as a result of the DOE defendants deliberate indifference to his injuries. Everyone who knew plaintiff before the beating states that he has never been the same after the attack. He has suffered memory loss, probable brain and neurological damage, loss of use of his left hand (he is left-handed), an ongoing concussion, a severely scarred face, and other injuries.

# FIRST CLAIM FOR RELIEF
## VIOLATION OF CIVIL RIGHTS
### (Eighth Amendment)
### (All Defendants)

36. Plaintiff refers to and incorporates herein the allegations in all Paragraphs above.

37. Defendants violated plaintiff's Eighth Amendment by acting intentionally to place plaintiff at risk of substantial harm or with deliberate indifference to a known and substantial risk of harm to plaintiff while he was in their custody at the COUNTY jail. As a direct and proximate result of such intentional malfeasance or deliberate indifference, plaintiff suffered severe and permanent debilitating injuries.

38. As a further direct and proximate result of these acts of these defendants as described herein, plaintiff suffered numerous damages and expenses relating to these damages, including but not limited to medical expenses due to extreme emotional distress, legal fees, counseling expenses, loss of earnings, loss of enjoyment of life, and increased exposure to future violence.

39. The individual defendants' conduct was not only shocking and outrageous, it was intentional and malicious. Additionally, defendant's conduct was grossly negligent, exhibiting a deliberate and reckless disregard for plaintiff's rights, causing plaintiff to suffer humiliation, mental anguish, emotional and physical distress, and plaintiff was injured in mind and body, to his damage in amounts according to proof. As such plaintiff is entitled to punitive damages against defendants, according to proof.

## SECOND CLAIM FOR RELIEF

## VIOLATION OF CIVIL RIGHTS

### (Eighth Amendment)

### (Deliberate failure to provide adequate medical assistance)

40. Plaintiff refers to and incorporates herein the allegations in all Paragraphs above.

41. Defendants knew that plaintiff had suffered severe injuries and failed and refused to provide adequate medical care to plaintiff. The defendants knew of plaintiff's serious injuries because they not only could see the injuries but also plaintiff repeatedly requested medical help, complaining of severe pain in his head and his hand to no avail.

42. As a direct and proximate result of defendants deliberate and intentional failure and refusal to get medical help for plaintiff's serious injuries, plaintiff has suffered severe and permanent injuries including, but not limited to, loss of use of his hand, pain, emotional distress, loss of mental capacity, loss of income, loss of the ability to be gainfully employed and expenses for medical services and counseling.

## THIRD CLAIM FOR RELIEF

### FAILURE TO TRAIN AND/OR SUPERVISE
### (DEFENDANTS COUNTY AND ROBBINS)

43. Plaintiff refers to and incorporates herein the allegations in all Paragraphs above.

44. In the above alleged violations of Constitutional rights, defendants ROBBINS and COUNTY failed to provide adequate supervision and supervision to the DOE officers.

45. At all relevant times herein, plaintiff is informed and believes and alleges thereon that defendant COUNTY was fully aware and informed that the Santa Cruz County Sheriff's had a history of violating constitutional rights of citizens by ignoring inmates concerns, failing to provide adequate medical care, ignoring placement concerns, and allowing acts of extreme violence to occur. The COUNTY and ROBBINS developed, encouraged, tolerated and approved the above-described conduct, thereby causing the deprivation of plaintiff's constitutional rights and/or ignored and failed and refused to provide proper training to avoid the violation of inmates', including plaintiff herein, constitutional rights..

46. Defendant COUNTY and ROBBINS was either intentionally acting or failing to act, illegally acting or failing to act in a custom or manner pursuant to COUNTY and ROBBINS' policies, and/or were so grossly negligent in their internal training, supervision and discipline of the individually named defendant officers that they were deliberately indifferent to and demonstrated a reckless disregard toward the violation of plaintiff's federal constitutional rights which was likely to occur and did occur to plaintiff from their policies and customs, all in violation of plaintiff's civil rights.

47. Additionally, defendant COUNTY has displayed deliberate indifference to the rights of citizens, and, based upon the principles set forth in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), is thereby liable for all injuries and damages sustained by plaintiff as set forth in this complaint.

48. The above-described policies and customs were a driving force behind the actions of the individual defendant, resulting in pecuniary and non-pecuniary injury to plaintiff. Said damages were incurred as a direct and proximate result of the acts and omissions of the county in failing to properly train and supervise and in maintaining unlawful customs and policies.

## DEMAND FOR JURY TRIAL

49. Plaintiff hereby demands a trial by jury on all of the above claims for relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief as to all Claims for Relief:

A. A judgment awarding plaintiff general and special damages against defendants and punitive damages against the individual defendants in amounts according to proof;

B. A judgment awarding plaintiff reasonable attorney's fees;

C. A judgment awarding plaintiff his costs of suit; and

D. Such other and further relief as the Court deems proper.

RESPECTFULLY SUBMITTED:

Dated Feb. 05, 2008

_____
AARON LODGE
Attorney for plaintiff ISAAC VALDIVIA